IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**THOMAS BALDWIN,**                                        Case No. 1:17 CV 1414

      Plaintiff,

      v.                                        Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                        MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Thomas Baldwin ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 9). For the reasons stated below, the undersigned affirms in part, and reverses and remands in part, the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in July 2014, alleging a disability onset date of October 26, 2011. (Tr. 162-68). His claims were denied initially and upon reconsideration. (Tr. 92-95, 99-102). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 106). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on April 26, 2016. (Tr. 39-63). On May 13, 2016, the ALJ found Plaintiff not disabled through his date last insured (December 31, 2015) in a written decision. (Tr. 22-33). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1-5); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on July 6, 2017. (Doc. 1).

FACTUAL BACKGROUND

Personal Background and Testimony

Plaintiff was born in February 1964, making him 47 years old on his alleged onset date, and 52 years old at the time of the hearing. *See* Tr. 43, 162. He had a tenth grade education. (Tr. 44). In a Disability Report, Plaintiff alleged his ability to work was limited due to a torn right Achilles tendon, right shoulder surgery, and nerve damage. (Tr. 185). He also pointed to the results of EMG testing and an arthrogram. *Id.*

At the hearing, Plaintiff testified he could not work due to "excruciating" pain in his neck, shoulder, and middle of his back. (Tr. 48). He underwent cortisone injections and was prescribed 800 milligrams of ibuprofen. (Tr. 49). The ibuprofen helped, but Plaintiff could not take it frequently due to stomach problems. (Tr. 49-50). Plaintiff estimated he could stand for two hours at a time, and could bend, stoop, and squat. (Tr. 50-51). He could sit for a "couple" of hours, and could lift a gallon of milk with his left hand. (Tr. 51). His pain worsened with stress, lifting and carrying. (Tr. 55). Plaintiff had numbness in the fingers of his right hand. (Tr. 55).

Plaintiff also testified to bipolar disorder and depression, for which he took Lamictal. (Tr. 49-50). The medication helped somewhat, but his mental health provider was planning to change his medications. (Tr. 50). Plaintiff saw both a psychologist and psychiatrist. (Tr. 52). The psychologist was helping him develop coping skills. *Id.* Plaintiff testified he did not have much patience and was confrontational with others. (Tr. 56). He also had difficulty with concentration and accepting criticism from others. (Tr. 57-58).

Plaintiff was able to perform self-care tasks without assistance. (Tr. 53). He could cook simple meals, and do the dishes, but did not do laundry. *Id.* Sometimes he went grocery shopping with his wife. *Id.* On a typical day, Plaintiff watched television and used the internet. (Tr. 54) He also attended AA meetings where he had "a small network of people" with whom he interacted. *Id.*

Medical Evidence

Physical Health Records

In November 2011, Plaintiff saw Jared Levin, M.D., at the Center for Orthopedic Surgery for right shoulder pain. (Tr. 304). He told Dr. Levin that he developed pain in his right shoulder on October 26, 2011, while working overhead on a car with a 25-pound slide hammer. *Id.* Dr. Levin noted positive impingement and crepitus, decreased rotator cuff strength, and significant discomfort limiting range of motion. *Id.* He ordered an MRI, prescribed medication, and instructed Plaintiff to discontinue use of a sling and "start working on passive range of motion supine forward flexion". (Tr. 304-05). The MRI showed a focal mild to moderate grade partial articular surface tear at the anterior aspect of the infraspinatus, a small amount of fluid in the subacromial-subdeltoid bursa probably from secondary bursitis, and severe or near complete atrophy of the teres minor muscle. (Tr. 274).

At a follow-up visit later that month, Plaintiff reported shooting pain in his right arm from his neck to his hand, as well as numbness and tingling in the hand. (Tr. 306). Naproxen provided "minimal" relief. *Id.* Dr. Levin noted similar physical findings as before, and that the MRI showed a "partial thickness rotator cuff tear." *Id.* He ordered an EMG of the right upper extremity to evaluate neurologic injuries, and prescribed physical therapy. *Id.* He also suggested a cortisone injection. *Id.*

In December 2011, Plaintiff reported continuing symptoms, and Dr. Levin made similar findings on examination. (Tr. 308). Dr. Levin administered an injection, instructed Plaintiff to attend physical therapy, and noted Plaintiff was scheduled to have an EMG. (Tr. 308-09).

A January 2012 nerve study and EMG revealed findings suggestive of median nerve entrapment at the wrist "but with normal sensory findings and motor unit activation." (Tr. 278). There was no evidence of right motor axillary neuropathy, peripheral neuropathy, brachial plexopathy, or cervical radiculopathy. *Id.* Plaintiff returned to Dr. Levin that month reporting persistent sharp shooting pains in his right shoulder, radiating down his arm and up his trapezius muscle. (Tr. 310). Dr. Levin noted the EMG showed no evidence of brachial neuritis or right axillary neuropathy, but he did have evidence of carpal tunnel syndrome. *Id.* He emphasized that Plaintiff should use his arm for day-to-day activities, exercise daily, and continue with physical therapy. *Id.* Dr. Levin ordered an MRI of Plaintiff's cervical spine. *Id.*

In February, Dr. Levin noted Plaintiff's pain continued and opined it was "likely related to cervical radiculopathy." (Tr. 312). He again noted the need for a cervical spine MRI and to continue with physical therapy. *Id.* Dr. Levin made similar comments in April. (Tr. 313).

Plaintiff returned to Dr. Levin in June 2012, reporting persistent shooting pain in his right shoulder, worse with overhead reaching and lifting activities. (Tr. 315). He noted improvement for about two weeks after the December 2011 cortisone injection. *Id.* Dr. Levin reviewed Plaintiff's cervical spine MRI, which demonstrated no evidence of nerve root impingement, but opined Plaintiff's "arm symptoms are still suggestive of a neurologic issue despite the EMG results." *Id.* Dr. Levin's plan was to try another cortisone injection, but if the pain returned, to consider a shoulder arthroscopy. *Id.*; *see also* Tr. 317 (injection).

In July, Plaintiff reported five days of relief from the cortisone injection, with a gradual return of the pain. (Tr. 319). Dr. Levin recommended shoulder arthroscopy with subacromial decompression and debridement as needed. *Id.* Plaintiff underwent the surgery on July 23, 2012. (Tr. 265-66).

At his first post-operative appointment in August 2012, Dr. Levin noted Plaintiff was making adequate progress with decreasing pain. (Tr. 320). In September, he continued making progress and having less pain. (Tr. 321). In October, Plaintiff reported intermittent moderate throbbing pain, worse with overhead reaching and lifting. (Tr. 322). Dr. Levin noted Plaintiff was making progress in therapy and his rotator cuff strength continued to improve. *Id.* Plaintiff reported similar pain in November, with increased pain as he tried to increase activity. (Tr. 324). Dr. Levin noted Plaintiff continued to improve and would continue his therapy program. *Id.* Plaintiff reported similar pain in January 2013, noting he tried to increase his exercise level with therapy, but had pain when trying to perform more strenuous exercises. (Tr. 326) ("Overall[,] however[,] he does note improvement."). Dr. Levin noted Plaintiff needed to work on strengthening in physical therapy. *Id.*

In March 2013, Plaintiff underwent an independent medical examination with Richard Deerhake, M.D., as part of his workers' compensation case. (Tr. 467-70). On examination, Dr. Deerhake noted visible atrophy in the proximal biceps area, and decreased shoulder range of motion. (Tr. 469). His strength was "approximately 4+" in abduction, forward flexion, internal rotation, and external rotation. *Id.* Dr. Deerhake recommended denying physical therapy, and that Plaintiff have either an MRI arthrogram or get a second opinion from a shoulder surgery specialist. (Tr. 469-70). An MRI arthrogram in April 2013 showed a partial tear of the anteroinferior glenois labrum, and an intact rotator cuff repair without recurrent tear. (Tr. 271-72).

Plaintiff continued to follow up with Dr. Levin reporting "a sharp persistent shooting severe pain in the right arm." (Tr. 253, 255). On examination in June 2013, Dr. Levin noted positive impingement and crepitus. (Tr. 253). Plaintiff's rotator cuff strength was intact, but he had discomfort with testing. *Id.* Dr. Levin provided a cortisone injection later that month. (Tr. 255). In July, Plaintiff reported he had 90 percent relief of his pain for one week after the last injection. (Tr. 257). The pain—a moderate throbbing discomfort—gradually returned. (Tr. 257). Plaintiff was undergoing vocational rehabilitation and noted that use of the computer aggravated his symptoms. *Id.* Dr. Levin noted similar physical findings, and recommended Plaintiff continue with his exercise program, vocational rehabilitation, and pain management. *Id.*

Plaintiff next saw Dr. Levin in January 2014, where he continued to report pain radiating to his neck and trapezius muscles. (Tr. 259). The pain limited his ability to perform overhead reaching and lifting. *Id.* On examination, Dr. Levin noted positive impingement, crepitus, intact rotator cuff strength (but discomfort with testing), a slightly decreased range of motion of the cervical spine, and tenderness in the right trapezius and right cervical paraspinal muscles. *Id.* Dr. Levin noted Plaintiff's pain persisted "despite attempts at conservative treatment" and recommended a trigger point injection and possible acupuncture. (Tr. 260).

At his next visit in June 2014, Plaintiff reported continued pain. (Tr. 261). Dr. Levin noted similar physical findings as those in January, and administered a cortisone injection. (Tr. 261-62).

In October 2014, Plaintiff underwent a consultative physical evaluation with Guy Klein, M.D. (Tr. 287-95). Plaintiff had decreased sensation to light touch in his right arm and hand (Tr. 290), and reduced strength (4/5) in his right arm from shoulder to finger (Tr. 292). His ability to grasp, manipulate, pinch, and perform fine coordination was normal. *Id.* Dr. Klein noted Plaintiff "was able to lift, carry and handle light objects". (Tr. 290). Dr. Klein noted reduced strength,

"particularly with abduction of the right arm." (Tr. 291). Dr. Klein noted Plaintiff had limitations in his right arm with lifting and carrying, as well as manipulating. *Id.*

Later that month, Plaintiff told Dr. Levin he had good relief for approximately three weeks following his previous cortisone injection. (Tr. 356). He again reported a persistent moderate throbbing pain, worse with overhead reaching and lifting. *Id.* Dr. Levin again found positive impingement and crepitus, as well as discomfort with rotator cuff strength testing and tenderness on the right-sided trapezius and cervical paraspinal muscles. *Id.* Dr. Levin prescribed a Medrol Dosepak and Mobic. *Id.* He noted Plaintiff would benefit from additional physical therapy and should see a neurologist. *Id.*

In November 2014, Plaintiff underwent an independent medical examination with David A. Garcia, D.O., as part of a workers' compensation claim. (Tr. 486-89). On examination, Dr. Garcia found "exquisite tenderness on palpation" in Plaintiff's paraspinal muscles, midline region, and right trapezius. (Tr. 488). Plaintiff also displayed atrophy and tenderness on the right side of his trapezius. *Id.* Dr. Garcia opined Plaintiff had not reached maximum medical improvement as he "continue[d] to be symptomatic" and he could not return to his former work as a collision technician. *Id.* Dr. Garcia noted Plaintiff's current treatment—consisting solely of Mobic—was necessary and appropriate. (Tr. 489). He recommended Plaintiff have an axillary injury to the nerve on the right side of his trapezius muscle investigated. *Id.*

A January 2015 EMG study was normal except for "very mild abnormality strongly suggesting mild carpal tunnel syndrome." (Tr. 375). The physician found "no evidence of neurological injury related to the shoulder". *Id.*

Plaintiff returned to Dr. Levin in February, continuing to report a persistent moderate throbbing pain in his right shoulder. (Tr. 376). The Medrol Dosepak had provided two weeks of

pain relief. *Id.* On examination, Plaintiff had slight impingement, crepitus, mild tenderness in his shoulder, and intact rotator cuff strength, with mild discomfort. *Id.* Dr. Levin noted that "[t]o some extent his pain has decreased[,] but he still has a sense of weakness and is not as strong as previously with the shoulder." *Id.* Dr. Levin prescribed another Medrol Dosepak, and advised Plaintiff to discuss a regular low dose steroid with his primary care physician. (Tr. 377). He also noted Plaintiff would continue with his shoulder exercise program. *Id.*

In April, Plaintiff reported having "the usual intermittent throbbing discomfort" in his shoulder, but developed increased pain two days prior. (Tr. 378). He also had occasional numbness and tingling radiating into his arm. *Id.* X-rays showed Plaintiff's rotator cuff anchor was well-positioned and Dr. Levin instructed him to take anti-inflammatories, avoid aggravating activities, and follow up if he was not improved in four to six weeks. (Tr. 379).

That same month, Plaintiff underwent a consultative physical examination with Michael A. Harris, M.D., related to his workers' compensation claim. (Tr. 478-80). Plaintiff reported ongoing pain in his right shoulder and that chiropractic treatments helped "for about a day or two", but provided no lasting relief. (Tr. 478). On examination, Dr. Harris found Plaintiff had tenderness and decreased shoulder strength, but no wasting. (Tr. 479). His grip strength was good, and he had normal right sensation and reflexes. *Id.*

*Physical Limitation Opinion Evidence*

As noted above, in October 2014, Dr. Klein opined Plaintiff had moderate limitations with lifting and carrying due to right arm weakness and pain. (Tr. 291). He also opined Plaintiff would only be able to perform manipulative activities such as reaching, handling, feeling, grasping, and fingering occasionally "secondary to right arm weakness, pain, and decreased sensation." *Id.*

Finally, Dr. Klein thought Plaintiff could sit, stand and walk normally in an eight-hour workday with normal breaks. *Id.*

Later that month, state agency physician Anne Prosperi, D.O., reviewed Plaintiff's records. (Tr. 70-72). Dr. Prosperi opined Plaintiff could frequently lift or carry ten pounds, and occasionally lift or carry twenty pounds. (Tr. 71). He could sit, stand, or walk, for six hours in an eight-hour workday. *Id.* He could never climb ladders, ramps, or scaffolds, and only occasionally crawl. (Tr. 71-72). Dr. Prosperi noted he was limited to occasional pushing and pulling with the right upper extremity, and occasional overhead reaching. (Tr. 71-72).[1] She noted he was not limited in handling, fingering, or feeling, citing normal findings at the consultative examination with Dr. Klein. (Tr. 72) ("At CE [claimant] noted to have normal [bilateral] grips and manipulative abilities"). In January 2015, William Bolz, M.D., reviewed Plaintiff's records and affirmed Dr. Prosperi's findings. (Tr. 84-86).[2]

In November 2014, Dr. Garcia offered temporary work restrictions ("for approximately 90 days"). (Tr. 489). He opined Plaintiff was limited to lifting ten pounds frequently or twenty pounds occasionally. *Id.* He could reach below the knees, push, pull, and lift above the shoulders occasionally. *Id.*

In April 2015, Dr. Harris opined Plaintiff had reached maximum medical improvement after exhausting all his surgical and conservative treatment options. (Tr. 479). He did not believe Plaintiff could return to his former employment. (Tr. 480). Dr. Harris opined Plaintiff had "significant limitations" and could only lift ten to fifteen pounds "occasionally, close to his body".

---

1. Dr. Prosperi limited Plaintiff to "[o]ccasional L overhead reaching". (Tr. 72). This appears to be a typographical error because she explained her opinion was based on "intact [range of motion] except for R shoulder". *Id.*
2. Dr. Bolz corrected Dr. Prosperi's typographical error. *See* Tr. 86 ("Occasional R overhead reaching[.]").

*Id.* He should "[a]void any lifting above shoulder level on the right." *Id.* Dr. Harris concluded: "Unfortunately, I have no further treatment options to offer. He needs to find work at a sedentary level." *Id.*

Mental Health Records

In September 2014, Plaintiff underwent a consultative psychological evaluation with Mitchell Wax, Ph.D. (Tr. 280-85). Plaintiff reported anxiety and depression related to his medical problems. (Tr. 280). Plaintiff reported previous treatment twenty years prior for bipolar disorder and PTSD related to an industrial accident. (Tr. 281). Plaintiff cooked simple foods once or twice per week, though his wife typically cooked dinner and did most of the household chores. (Tr. 282). Plaintiff drove his wife to and from work, and watched television during the day. *Id.* After dinner, he walked with his wife for twenty to thirty minutes. *Id.* Plaintiff reported a good relationship with his wife, and one out-of-state friend with whom he kept in contact twice per month. *Id.* He also attended church once or twice per month, and AA meetings twice per week, and grocery shopped weekly with his wife. *Id.* On examination, Dr. Wax noted he appeared anxious ("[I]ntermittent fidgeting was noted") and reported agoraphobia ("I don't like being out of the house by myself."). (Tr. 283). Dr. Wax opined Plaintiff appeared to be functioning in the low average range of intelligence, and his ability to concentrate was generally good. *Id.* Dr. Wax noted Plaintiff could maintain himself in the community without outside resources. *Id.*

In March 2015, Plaintiff underwent a consultative psychological evaluation with Raymond D. Richetta, Ph.D., as part of his workers' compensation case. (Tr. 360-66). Plaintiff reported "pain and fear" associated with his shoulder injury. (Tr. 361). He reported his shoulder pain was "still unbearable at times". *Id.* On examination, Dr. Richetta noted Plaintiff described reduced mental focus, irritable mood, agitation, racing thoughts, and intermittent feelings of hopelessness. (Tr.

364). Plaintiff reported a prior diagnosis of bipolar disorder. (Tr. 365). Dr. Richetta noted Plaintiff's "current stress from the work injury significantly contributes to his increase in psychological symptoms[.]". *Id.* Dr. Richetta diagnosed Bipolar I Disorder, Most Recent Episode Depressed, Moderate. *Id.* Dr. Richetta noted Plaintiff could not work, and would benefit from psychotherapy and a return to psychotropic medication management. (Tr. 366).

In April, Plaintiff presented to Krunal Jethwa, M.D., at Fairview Family Medicine for mental health treatment. (Tr. 234). Plaintiff reported a prior diagnosis of bipolar disorder and that he suffered from "multiple episodes of cycling bipolar" over the past few months. *Id.* He reported he was seeing a psychologist. *Id.* On examination, Dr. Jethwa noted Plaintiff's mood was euthymic, and that he had normal speech and good eye contact. *Id.* He started Plaintiff on a low-dose mood stabilizer (Lamictal) and advised him to follow up with a psychiatrist. *Id.*

In September 2015, Plaintiff underwent a psychological evaluation with Marian Chatterjee, Ph.D., as part of the workers' compensation process. (Tr. 401-02). Dr. Chatterjee noted Plaintiff had moderate limitation in: activities of daily living, social functioning, and concentration, persistence, and pace; he had marked limitations in adaptation. (Tr. 402). During his initial therapy session, Plaintiff was "tearful and very agitated". (Tr. 415). Dr. Chatterjee noted Plaintiff's prognosis was "poor". *Id.* Later that month, Plaintiff was "tearful, yelling and anxious". (Tr. 419). Dr. Chatterjee noted Plaintiff was "[o]ff his meds" and needed to be seen by a psychiatrist "ASAP". *Id.* At the next appointment, Dr. Chatterjee worked with Plaintiff on mindfulness and meditation, noting he "did really well". (Tr. 421). His prognosis was "poor", but his progress was "improving". *Id.*

In early October 2015, Plaintiff appeared calmer and did not raise his voice the entire session. (Tr. 423). Dr. Chatterjee again noted Plaintiff needed to see a psychiatrist "ASAP" and

that he had an appointment scheduled for later that month. *Id.* She again assessed "poor" prognosis, but "improving" progress. *Id.*

Later that month, Plaintiff saw Przemyslaw Kapalczynski, M.D., for an initial psychiatric evaluation. (Tr. 367-69). Dr. Kapalczynski noted Plaintiff's history of bipolar disorder, and past treatment with medication. (Tr. 368). Dr. Kapalczynski observed Plaintiff was cooperative and pleasant, and at times tense, but appropriate. *Id.* His speech was coherent, and thought processes organized, logical, and goal-directed. *Id.* He had no evidence of psychotic thoughts or suicidal/homicidal/violent ideation. *Id.* His memory, attention, and concentration were intact. *Id.* He described his mood as "up and down" and his affect was "tense". *Id.* Dr. Kapalczynski prescribed Lamictal and advised Plaintiff to follow up in four weeks. (Tr. 369).

In November 2015, Plaintiff reported to Dr. Kapalczynski that he was doing better after restarting Lamictal. (Tr. 371). Dr. Kapalczynski observed Plaintiff to be "calm and appropriate", as well as "rational and logical". *Id.* Dr. Kapalczynski made the same observations the following month, though he noted Plaintiff continued to report an "up and down" mood and irritability. (Tr. 372). Plaintiff's affect was restricted, and he was "[t]ense at times." *Id.* Dr. Kapalczynski increased Plaintiff's Lamcital and Vistaril dosages to "target[] mood swings, bipolar". (Tr. 373).

Plaintiff continued to see Dr. Chatterjee through January 2016 for therapy sessions. *See* Tr. 425-53. At the last session before she left the practice, Dr. Chatterjee noted Plaintiff "voiced how much progress he has made and how he was able to let go of a lot of baggage from the past." (Tr. 451). Plaintiff also noted his wife noticed his improvement. *Id.* Dr. Chatterjee assessed Plaintiff's prognosis as "fair" and progress as "improving." *Id.*

Following Dr. Chatterjee's departure, Plaintiff started seeing Jamie B. Lichstein, Psy.D., for therapy sessions. (Tr. 454-59). At their initial session in February 2016, Dr. Lichstein noted

Plaintiff "came into today's session with significant anger and resistance." (Tr. 455). He noted he was "doing better" and "starting to focus", but was back to "feeling overwhelmed." *Id.* Dr. Lichstein indicated Plaintiff's prognosis was "fair" and progress was "improving". *Id.*

*Mental Limitation Opinion Evidence*

In September 2014, Dr. Wax opined Plaintiff would be able to understand, remember and carry out instructions, citing Plaintiff's ability to cook simple meals, and previous ability to work on his car. (Tr. 284). He also found Plaintiff would be able to maintain attention and concentration. *Id.* Dr. Wax did not believe Plaintiff would have any difficulty responding appropriately to supervisors or coworkers in a work setting, or responding to work pressures. *Id.*

In October 2014, state agency physician Melanie Bergsten, Ph.D., reviewed Plaintiff's records. (Tr. 69, 73-74). She opined Plaintiff had mild restrictions in activities of daily living and maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 69). She believed Plaintiff would be able to understand simple instructions, sustain concentration and persistence to perform tasks that are not fast paced, would not have difficulty interacting with others, and should be limited to simple three to four step tasks. (Tr. 73-74). In January 2015, Paul Tangeman, Ph.D., affirmed Dr. Bergsten's opinions. (Tr. 83, 87-88).

In March 2015, Dr. Richetta opined that Plaintiff's "symptoms, including sadness with suicidal ideation, agitation, mood swings, irritable moods, reduced concentration, reduced energy, indecisiveness, insomnia, and overall hopelessness preclude his returning to any form of employment at this time." (Tr. 366). In a "Physician's Report of Work Ability" form, Dr. Richetta stated Plaintiff was temporarily not released to work from March 4, 2015 through November 4, 2015. (Tr. 358). He noted Plaintiff had moderate restriction in: activities of daily living, social

functioning, and concentration, persistence, and pace; he had marked limitation in adaptation. *Id.* He opined that Plaintiff was "[t]oo agitated, depressed" for vocational rehabilitation. *Id.*

In January 2016, Dr. Chatterjee completed a functional status assessment. (Tr. 404). She opined Plaintiff had moderate limitation in activities of daily living noting anhedonia, lack of purpose, insomnia and low energy, but she noted Plaintiff managed self-care, watered plants, and spent time in his yard. *Id.* She opined Plaintiff had moderate limitation in social functioning, noting irritability, avoidance and anger outbursts, but that he loves his family. *Id.* She found moderate limitation in concentration, persistence, and pace, noting difficulty with initiation and persistence, and a lack of routine. *Id.* Finally, she noted marked limitation in adaptation, citing that Plaintiff was emotionally overwhelmed, avoidant, agitated, poorly motivated, had difficulty making decisions, decompensates with low stress, had occasional homicidal thoughts, and tearfulness. *Id.*

In February 2016, after an initial therapy session, Dr. Lichstein completed a form assessing moderate limitations in activities of daily living, noting Plaintiff could complete activities of daily living, but he was impaired by mood swings. (Tr. 410). She also assessed moderate limitations in social functioning, noting Plaintiff had few close friends, but was close to his family and actively participated in AA. *Id.* She noted Plaintiff's anger and mood agitation made it difficult for him to concentrate, and that Plaintiff was easily overwhelmed and agitated, making it difficult for him to cope with stress. *Id.* She therefore assessed marked limitations in concentration, persistence and pace, and adaptation. *Id.*

In April 2016, Dr. Lichstein completed a mental residual functional capacity assessment. (Tr. 500-02). She provided Plaintiff with weekly to bi-weekly psychotherapy treatment since February 2016, and that he had a diagnosis of bipolar disorder. (Tr. 500). Plaintiff's symptoms were "reduced overall" with psychotherapy. *Id.* Dr. Lichstein opined that Plaintiff's symptoms

were severe enough to interfere with attention and concentration necessary to perform simple tasks great than 25 percent of the time. *Id.* She explained that Plaintiff was agitated, overwhelmed, angry, and had a poor frustration tolerance and pool coping skills. *Id.* She opined Plaintiff would miss work one to three times per week due to pain and emotional distress from his pain, noting that his emotional symptoms were "severe in nature." (Tr. 501). Dr. Lichstein opined Plaintiff was not significantly limited in his ability to remember work procedures, or understand and carry out short and simple instructions. *Id.* He had moderate limitation in the ability to sustain an ordinary routine, and marked to extreme limitation in most other mental work-related activities. (Tr. 501-02). In conclusion, Dr. Lichstein explained: "Mr. Baldwin has a lot of pride and he feels significant shame over this process. He would most like to return to his profession, however, since his injury [and] his inability to do so, his Bipolar Disorder symptoms have caused him significant impairment." (Tr. 502).

VE Testimony

At the hearing, the ALJ asked the VE to consider an individual of Plaintiff's age, education, and past work experience, who was limited in the way ultimately found by the ALJ. *See* Tr. 59. The VE responded that such an individual could not perform past work, but could perform other jobs existing in significant numbers in the national economy. (Tr. 59-60). The VE also testified that an individual who would be off-task at least twenty percent of the time, or missed one day of work per week would not be able to perform such jobs. (Tr. 60-61).

Counsel inquired of the VE whether adding a limitation to "lifting 10 to 15 pounds and occasional use of the right upper extremity" would affect the VE's testimony. (Tr. 61). The VE replied that such a restriction would limit an individual to sedentary work. *Id.*

ALJ Decision

In his written decision, the ALJ found Plaintiff last met the insured status requirements for DIB on December 31, 2015, and had not engaged in substantial gainful activity from his alleged onset date of October 26, 2011 through his date last insured. (Tr. 24). He had severe impairments of status-post arthroscopy; rotator cuff repair, debridement, and decompression; bipolar disorder with depression; panic disorder with agoraphobia; and alcohol and drug abuse in sustained remission." *Id.* The ALJ found none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment. (Tr. 25). He then concluded Plaintiff had the residual functional capacity

> to perform a range of light work as defined in 20 CFR 404.1567(b), except: [he] should not perform climbing of ladders, ropes or scaffolds; can perform frequent climbing of ramps and stairs, balancing, stooping, kneeling and crouching, and occasional overhead reaching with the right arm and crawling; and he is limited mentally to performing simple, routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions (no arbitration, negotiation or confrontation) (20 CFR 404.1569a).

(Tr. 26). The ALJ found Plaintiff was unable to perform any past relevant work (Tr. 31), however, considering his age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that Plaintiff could have performed (Tr. 32). Therefore, the ALJ concluded Plaintiff was not disabled from his alleged onset date (October 26, 2011) through his date last insured (December 31, 2015). (Tr. 33).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff contends the RFC is not supported by substantial evidence. Specifically, with regard to the physical RFC, he contends the ALJ erred in his evaluation of the opinion of consultative examiner Dr. Klein, and erred by omitting any consideration of Dr. Harris's opinion. With regard to the mental RFC, Plaintiff contends the ALJ erred in rejecting the opinions of Drs. Richetta, Chatterjee, and Lichstein, and assigning great weight to the opinion of Dr. Wax. The Commissioner attempts to re-characterize Plaintiff's argument as one about credibility, and responds that the ALJ did not err and his decision is supported by substantial evidence. For the reasons discussed below, the undersigned affirms the ALJ's evaluation of Plaintiff's mental limitations, but remands for further consideration regarding Plaintiff's physical limitations.

Physical RFC

Plaintiff contends the ALJ erred in evaluating his physical RFC in two ways: 1) by assigning great weight to Dr. Klein's opinion, but omitting the manipulative restrictions contained therein without explanation; and 2) by omitting any consideration or discussion of Dr. Harris's

opinion. The Commissioner responds that the ALJ's decision is supported by substantial evidence and should be affirmed.

"An ALJ is bound to adhere to certain governing standards when assessing the medical evidence in support of a disability claim." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014). "Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(3), 404.1512(b), 404.1513). The regulations provide that the Commissioner "will always consider the medical opinions in . . . [a claimant's] case record together with the rest of the relevant evidence . . . receive[d]." 20 C.F.R. § 404.1527(b). Further, "[u]nless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinion from treating sources, nontreating sources, and other nonexamining sources who do not work for us." 20 C.F.R. 404.1527(e)(2)(ii).[3]

An ALJ can consider all the medical opinion evidence without directly addressing every piece of evidence in the opinion. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). However, if a medical source's opinion contradicts the ALJ's RFC finding, an ALJ must explain why he did not include the medical source's limitation in his determination of the claimant's RFC. *See* SSR 96-8p, 1996 WL 374184, at *7. Social Security Ruling 96-8p provides: "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the

---

3. The undersigned uses the version of the regulations applicable to the ALJ's May 2016 opinion.

opinion was not adopted." *Id.* Courts in the Northern District of Ohio have held that an ALJ's failure to comply with this regulation requires reversal. *See Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (ALJ's failure to address a medical source's opinion which conflicted with RFC constituted reversible error); *Thompson v. Comm'r of Soc. Sec. Admin*, 2014 WL 356974, at *4 (N.D. Ohio) (remanding because ALJ did not explain failure to adopt in the RFC a conflicting limitation assigned by medical sources); *Moretti v. Colvin*, 2014 WL 37750, at *10 (N.D. Ohio) (remanding because ALJ failed to explain why she did not include in the RFC a limitation assigned by a medical source).

Plaintiff is correct that the ALJ's decision contains no mention of Dr. Harris's opinion. The Commissioner responds that "[a]lthough the ALJ did not discuss Dr. Harris's opinion in his decision, the ALJ did analyze the body of evidence developed as part of Plaintiff's workers' compensation claim, which included Dr. Harris's examination and opinion[.]" (Doc. 13, at 20-21). Further, the Commissioner argues the ALJ implicitly rejected Dr. Harris's opinion by "grant[ing] weight to other medical opinions . . . which assessed less restrictive limitations than Dr. Harris and were consistent with his RFC finding[.]" *Id.* at 20. But this does not satisfy the regulation's requirement that "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7.[4] Dr. Harris was a consultative examiner who offered an opinion containing restrictions in conflict with the RFC. *Compare* Tr. 480 (opining Plaintiff could only lift ten to fifteen pounds "occasionally, close to his body", should "[a]void any lifting above shoulder level on the right", and "need[ed] to find work at a sedentary level"), *with* Tr. 26 (RFC limiting Plaintiff to "light

_____

4. If adopting conflicting opinions was sufficient, 20 C.F.R. § 1527(e)(2)(ii) and SSR 96-8p, requiring explanation, would be rendered meaningless.

work", and "occasional overhead reaching with the right arm"). Remand is thus required for the Commissioner to address this opinion.[5]

As to Dr. Klein's opinion, the ALJ accurately summarized that opinion (including its limitation to occasional right-sided reaching, handling, feeling, grasping, and fingering), and assigned it "great weight" because it was "supported by the record as a whole, and is consistent with his contemporaneous examination notes." (Tr. 28). Plaintiff is correct that the ALJ did not explain why he did not include Dr. Klein's restrictions to occasional reaching, handling, fingering, feeling, grasping, and fingering on the right side. *See* Tr. 26 (including only a limitation to occasional overhead reaching with the right arm); Tr. 28 (discussion of Dr. Klein's opinion). The Commissioner responds that the ALJ's decision as a whole demonstrates he did not credit this opinion because it was inconsistent with the record. In the paragraph prior to his consideration of Dr. Klein's opinion, the ALJ discussed the various medical records related to Plaintiff's shoulder impairment. *See* Tr. 27-28. He did not, however, in that paragraph, provide any specific discussion regarding manipulative limitations. Because remand is already required to address Dr. Harris's opinion, on remand the Commissioner should clarify consideration of these additional limitations within Dr. Klein's opinion.

Mental RFC

Plaintiff contends the ALJ erred in assigning great weight to the opinion of Dr. Wax, who did not have all of Plaintiff's records and assessed no work related limitations, and in rejecting the opinions of Drs. Richetta, Chatterjee and Lichstein. The Commissioner responds that the ALJ's

---

5. Remand is particularly appropriate in a situation such as this where Plaintiff's counsel, at the hearing, presented a specific argument about Dr. Harris. *See* Tr. 61-62 ("And then alternatively again is the limitation to lifting 10 to 15 pounds. That was found in the consultative report of Dr. Harris who is an independent medical evaluator that evaluated Mr. Baldwin. He thought Mr. Baldwin should push to a sedentary occupation[.]").

decision is supported by substantial evidence. For the reasons discussed below, the undersigned affirms the Commissioner's determination regarding Plaintiff's mental impairments.

*Dr. Wax*

Plaintiff contends the ALJ erred in his consideration of Dr. Wax's opinion because: 1) Dr. Wax did not consider all of the record evidence, as the ALJ stated, and 2) Dr. Wax did not assess any work-related restrictions, which is inconsistent with the ALJ's finding of moderate difficulties in social functioning, and concentration, persistence and pace. (Doc. 11, at 14-15). The undersigned finds no error.

The ALJ here explained his consideration of Dr. Wax's opinion:

> [C]onsultative examiner, Mitchell Wax, Ph.D., opined the claimant "would be able to understand, remember, and carry out instructions . . . maintain attention and concentration on a job . . . would have no difficulty responding appropriately to supervisors and coworkers in a work setting . . . [and] would respond appropriately to work pressures in a work setting based upon his functioning" (Exhibit 3F). The undersigned has given great weight to Dr. Wax's mental functional assessments. Dr. Wax is a specialist in psychology, he has an awareness of all the evidence in the record, and he has an understanding of social security disability programs and evidentiary requirements. Most importantly, his opinion is supported by the objective medical evidence and it is consistent with the record [as] a whole including the claimant's ability to follow simple instructions, as demonstrated with cognitive functioning tasks, [and] his ability to perform some complex tasks, such as working on his car.

(Tr. 29) (alteration to internal quotation in original).

The ALJ provided substantially supported reasons for giving great weight to Dr. Wax's opinion. First, he properly noted Dr. Wax's specialty as a psychologist and familiarity with social security standards. (Tr. 29); *see* 20 C.F.R. § 404.1427(c)(5) ("We will generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty[.]"); 20 C.F.R. § 404.1527(c)(6) (noting "the amount of understanding of our disability programs and their evidentiary requirements that a medical source has" is a relevant factor in considering medical

opinions). Second, the ALJ properly considered that Dr. Wax's opinion as "consistent with the record [as] a whole including the claimant's ability to follow simple instructions". (Tr. 29); *see* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."); *see also* Tr. 284 (citing Plaintiff's ability to cook simple meals and work on his car); Tr. 368 (noting Plaintiff was attentive, answered questions appropriately, and was able to spell a word forward and backward); Tr. 501 (Dr. Lichstein's opinion Plaintiff was not significantly limited in his ability to understand and carry out short and simple instructions). Third, the ALJ considered the supportability of Dr. Wax's opinion, noting his opinion regarding instructions was "demonstrated with cognitive functioning tasks". (Tr. 29); *see* Tr. 283 (noting Plaintiff was able to concentrate, and was able to recall five digits forward and two digits backwards, remember two of three simple works on a recognition task, and was able to successfully add by threes to 40 after directions were repeated); 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion . . . the more weight we will give that medical opinion.").

Plaintiff is correct that the ALJ's statement that Dr. Wax "ha[d] an awareness of *all* the evidence in the record" (Tr. 29) is not accurate. Dr. Wax offered his opinion in September 2014, and there are both treatment records and opinion evidence subsequent to this date. However, given the other supported reasons noted above, the undersigned finds this misstatement does not rise to the level of reversible error. *See Brownfield v. Astrue*, 2010 WL 5557443, * (W.D. Ky.) ("judicial review does not contemplate a quest for administrative perfection").

The undersigned also finds no error in the ALJ's decision to assign great weight to Dr. Wax's opinion *and* to assign further limitations in the mental RFC. As the Commissioner points out, "it is difficult to see how the ALJ's decision to find Plaintiff more limited, which served to

increase his chance of being found disabled, supports a need to remand this case." (Doc. 13, at 21).

Moreover, the RFC determination is the province of the ALJ, not of a particular physician. *See* 20

C.F.R. § 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The

responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-

5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions

expressed in a medical source statement, a medical source statement must not be equated with the

administrative finding known as the [RFC] assessment."). As the Sixth Circuit recently explained:

> But "the *ALJ* is charged with the responsibility of determining the RFC based on *her* evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (emphasis added). An RFC is an "administrative finding," and the final responsibility for determining an individual's RFC is reserved to the Commissioner. SSR 96-5p, 1996 WL 374183, at * 1–2 (July, 2, 1996). "[T]o require the ALJ to base her RFC on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability." *Rudd*, 531 F. App'x at 728.

*Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017). Therefore, the

undersigned finds no error in the ALJ's decision to assign great weight to Dr. Wax's opinion, yet

also include additional mental limitations.

*Treating Psychologists*

Plaintiff next contends the ALJ erred in his consideration of treating psychologists Drs.

Richetta, Chatterjee and Lichstein. Specifically, Plaintiff contends these opinions were supported

and consistent with the ALJ's RFC determination and thus it was unreasonable to reject them.

Moreover, Plaintiff contends the records cited by the ALJ to discount these opinions does not

detract from them.

Plaintiff contends the ALJ's reasoning for rejecting these opinions (Tr. 30) is not supported.

Specifically, Plaintiff contends the ALJ's reliance on records from Fairview Family Medicine and

Dr. Kapalczynski was incorrect because "[t]hese records do not detract from Drs. Richetta's,

Chatterjee's and Lichstein's opinions." (Doc. 11, at 16). The undersigned, however, finds the ALJ cited substantial evidence to discount these opinions.

First, the ALJ correctly noted that the opinions' conclusions about disability were not entitled to any weight. He explained:

> [T]he undersigned finds the conclusions from the Workers' Compensation evaluations have no probative value and rejects Drs. Richetta, Lichstein, and Chatterjee's opinions. As an opinion on an issue reserved to the Commissioner, this statement is not entitled to controlling weight and is not given special significance pursuant to 20 CFR 404.1527(e) and 416.927(e) and SSR 96-5. The term "temporarily totally disabled" is a term of art in workers' compensation law that is not determinative under the criteria for a finding of disability pursuant to the Social Security Act. Therefore, the conclusion by a physician the claimant is "temporarily totally disabled" in the context of a workers' compensation case is not relevant with regard to the claimant's applications under the Social Security Act.

(Tr. 30). This is a valid reason. *See* 20 C.F.R. § 404.1527(d) (an opinion that a claimant is disabled is not given any "special significance" because this is an issue reserved to the Commissioner"); *Cosma v. Comm'r of Soc. Sec.*, 652 F. App'x 310, 311 (6th Cir. 2016) ("The ALJ reasonably gave no weight to Dr. Dhar's opinion because her conclusion that Cosma is totally disabled is a determination reserved to the Commissioner."); *Gossett v. Comm'r of Soc. Sec.*, 2013 WL 6632056, at *6 (S.D. Ohio) (noting that "an opinion that [a claimant] is temporarily totally disabled" is "a state law standard applicable to workers compensation matters"), *report and recommendation adopted by* 2014 WL 49818.

Second, the ALJ noted Dr. Richetta "attributed more serious functional limitations that are based on the claimant's subjective complaints rather than objective findings". (Tr. 30). This is a reason supported by the record to discount the opinion. In Dr. Richetta's mental status "examination", he noted Plaintiff "*said he is* depressed", "*said he has* racing thoughts and mood swings", and "*described* reduced mental focus, irritable moods, agitation, racing thoughts, and intermittent feelings of hopelessness." (Tr. 364-65) (emphasis added). Dr. Richetta then stated that

Plaintiff's "symptoms, including sadness with suicidal ideation, agitation, mood swings, irritable moods, reduced concentration, reduced energy, indecisiveness, insomnia, and overall hopelessness preclude his returning to any form of employment at this time." (Tr. 366).

Third, the ALJ noted that both Dr. Chatterjee and Dr. Lichstein noted improvement with treatment, and Dr. Richetta assessed "moderate" bipolar disorder. (Tr. 30). This is also supported by the record. *See* Tr. 365 (Dr. Richetta's assessment of moderate bipolar disorder); Tr. 390 (Dr. Chatterjee's note of improvement in avoidance behavior); Tr. 393 ("He has impaired concentration and attention (although this was improving when he was in treatment with Dr. Chatterjee)"); Tr. 394 ("He had been making progress prior to changing therapists."); Tr. 398 (same). *See See Deloach v. Comm'r*, 2014 WL 533591, at *14 (S.D. Ohio) (finding a claim of functional disability undermined by improvement demonstrated in treatment notes).

Fourth, the ALJ noted he rejected Dr. Lichstein's April 2016 Medical Source Statement because it was "unsupported by the findings and opinions contained in the records from Fairview Family Medicine, Dr. Chatterjee, Dr. Kapalczynski and Dr. Wax." (Tr. 30). This is supported by substantial evidence in the record. *See* Tr. 234 (Dr. Jethwa's April 2015 notation of euthymic mood, normal speech, and good eye contact, and referring Plaintiff to a psychiatrist); Tr. 451 (Dr. Chatterjee's January 2016 notation that Plaintiff had made progress, he had "learned a lot of skills" and his prognosis was "fair"); Tr. 368 (Dr. Kapalczynski's October 2015 mental status examination noting: tense but appropriate affect and behavior, coherent and relevant speech, logical and goal directed thoughts, no psychotic thoughts, intact judgment and insight, good attention and concentration); Tr. 371 (Dr. Kapalczynski's November 2015 mental status examination noting good eye contact, goal oriented and organized speech and thought process, intact judgment and insight, restricted affect, and Plaintiff's description of his mood as "better");

Tr. 372 (Dr. Kapalczynski's December 2015 mental status examination noting good eye contact, appropriate engagement, goal oriented speech and thought process, intact judgment and insight, restricted affect ("[t]ense at times"), and Plaintiff's description of his mood as "mostly OK"); Tr. 284-85 (Dr. Wax's September 2014 opinion that Plaintiff could understand, remember, and carry out instructions, maintain attention and concentration, and respond appropriately to supervision, coworkers, and work pressures) . Further, as a reason for discounting Dr. Lichstein's opinion, the ALJ noted that "as discussed above," Plaintiff "admits to abilities exceeding the limitations Dr. Lichstein assessed". (Tr. 30). Earlier in his opinion, the ALJ noted Plaintiff testified that he prepared simple meals, managed personal care needs, engaged in a number of daily activities requiring some degree of concentration, and had some ability to interact socially based on his stable marriage, relationships with his children, and with a friend. (Tr. 25). This testimony contradicts Dr. Lichstein's opinion that Plaintiff would, *inter alia*, be markedly limited in the ability to maintain attention and concentration for extended periods.

The ALJ therefore considered the consistency and supportability of these opinions as required by the regulations, *see* 20 C.F.R. § 404.1527(c), and reasonably found that the opinions offered were more extreme than supported by the record. As discussed above, the ALJ is tasked with evaluating the record as a whole and formulating an RFC. *See Shepard*, 705 F. App'x at 442-43. He did so here, and his decision is supported by substantial evidence as described above. Notably, the ALJ here imposed significant mental restrictions on Plaintiff's mental capacity: "performing simple, routine tasks in a low stress environment (no fast pace, strict quotas, or frequent duty changes) involving superficial interpersonal interactions (no arbitration negotiation or confrontation)." (Tr. 26). And, although Plaintiff can point to evidence suggesting a contrary conclusion, this Court must affirm even if substantial evidence or indeed a preponderance of the

evidence supports Plaintiff's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Such evidence exists here. As such, the undersigned affirms the Commissioner's decision regarding Plaintiff's mental limitations.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB not supported by substantial evidence and reverses and remands that decision for further proceedings.

 s/James R. Knepp II
United States Magistrate Judge